*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0426p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TERESA ANNE HENDERSON,

　　　　　　　*Plaintiff-Appellant,*

　　*v.*

WALLED LAKE CONSOLIDATED SCHOOLS, a
Michigan School District, et al.,

　　　　　　　*Defendants-Appellees.*

No. 05-1814

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-72841—Robert H. Cleland, District Judge.

Argued: July 25, 2006

Decided and Filed: November 16, 2006

Before: BATCHELDER and McKEAGUE, Circuit Judges; ACKERMAN, Senior District
Judge.[*]

---

**COUNSEL**

**ARGUED:** M. Michael Koroi, Plymouth, Michigan, for Appellant. Neil H. Goodman, CLARK
HILL PLC, Birmingham, Michigan, for Appellees. **ON BRIEF:** M. Michael Koroi, Plymouth,
Michigan, for Appellant. Neil H. Goodman, CLARK HILL PLC, Birmingham, Michigan, for
Appellees.

---

**OPINION**

---

　　McKEAGUE, Circuit Judge. Plaintiff-appellant Teresa Anne Henderson brings suit alleging
she was subjected to sexual harassment by her high school soccer coach. She asserts various claims
under state and federal law, alleging the coach, the school district and several school administration
officials are liable for sexual harassment, civil rights violations, gross negligence and slander. The
defendants' motion for summary judgment was granted by the district court because plaintiff had
failed to establish a genuine issue of material fact on any of her claims. On appeal, we affirm.

---

[*]The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting
by designation.

1

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In January 2002, Russell Todd Crawford, then 29 years old, applied for the position of head coach of the girls varsity soccer team at Walled Lake Western High School in Oakland County, Michigan.  After he was interviewed and references were contacted and a criminal background investigation was completed, Crawford was hired and commenced coaching in February 2002.[1] From the outset, he made it clear to team members and their parents that he was in charge, advising parents that any complaining about coaching decisions would result in reduction of their daughter's playing time.  Plaintiff Teresa Anne Henderson ("Teresa"), who had been the team captain the year before, was told by Crawford that she would not be the captain during the 2002 season because she had an attitude.  His "take charge" demeanor included the use of obscenities, as he often addressed his own  players in demeaning and vulgar terms.

Crawford's inappropriate conduct took other forms as well.  He would engage players in flirtatious conversations and make sexually suggestive remarks.  He would often invite players to his home for "team meetings" and was known to communicate with them by telephone and e-mail at unusual hours.  He began to express special interest in one player in particular, Jill Byrd, and even communicated his desire for her to Teresa.  Teresa discouraged Crawford from pursuing a relationship with Jill, but he ignored the advice and then threatened the entire team with "consequences" if anyone disclosed his relationship with Jill.  Based on her discussions with Jill, Teresa understood that Jill was uncomfortable with Crawford's special attention and that Jill viewed his advances, which came to include fondling, hugging and kissing, as unwelcome and offensive.

In early to mid-April 2002, Jill's parents became concerned about late evening communications between Crawford and their daughter.  They reported their concerns to Assistant Principal Kevin Clarke.  Clarke convened a meeting the next day, attended by himself, Crawford, Principal Lawrence Barlow, and Athletic Director David Yarbrough.  Crawford was somber and attentive at the meeting, which lasted 30 to 45 minutes.  He admitted that he had occasionally made phone calls and sent e-mail messages to team members at odd hours.  He acknowledged that he had stayed late after practice on one occasion talking with Jill in the school parking lot.  Remarking that he had a Masters Degree in psychology, Crawford acknowledged that when players confided in him, he sometimes engaged them in counseling-type discussions.

As a result of the meeting, a five-point memorandum was issued to Crawford.  Although no copy of the memo has been made a part of the record, its substantive contents are not in dispute.[2] Crawford was prohibited from:  (1) communicating with team members between the hours of 9:30 p.m. and 7:00 a.m.; (2) sending e-mail messages to team members without also sending a copy to Clarke; (3) counseling team members regarding personal matters; (4) conducting activities with team members off-campus unless a parent was present; and (5) engaging in a relationship with a team member that might be construed as inappropriate.  In addition to the memo, Clarke took other measures.  He had Jill Byrd's parents notified of the contents of the memo; he occasionally attended soccer practices and regularly attended the team's games; and he regularly spoke with players about "how things were going."  As it turned out, these measures were ineffectual.

---

[1] Although it appears Crawford had received a medical discharge from the U.S. Air Force in 1999, and had an ill-defined history of mental illness, these facts did not come to light in the application and interview process.

[2] Clarke's copy of the memo was presumably kept in the soccer file in his office file cabinet, but the file was found to be missing in early May 2002.  Clarke explained that the administrative team offices, with the file cabinet containing athletic files, were temporarily moved to the media center in the high school library during the 2001-02 school year, while the permanent offices were renovated.  Clarke testified that he was the only one with authorized access to the file cabinet, although it was not kept locked. The whereabouts of the missing soccer file are unknown.

Within two to three weeks after the memo issued, several noteworthy incidents occurred, only some of which are relevant to assessment of plaintiff's claims. On April 15, after a soccer match, Teresa reportedly went home and took an overdose of pain medication (approximately 11 tablets of ibuprofen and vicodin), in reaction to Crawford's persistent offensive and intimidating conduct.[3] At another game, a freshman member of the team, Shannon Steffen, approached Teresa and told her, in an emotionally distressed state, that Crawford had just asked her to feel his genitals. Teresa also witnessed Crawford treat other players in a physically abusive and intimidating manner. On one occasion, on or about April 29, Henderson was asked to serve as "look-out" on the team bus as Crawford huddled with Jill Byrd under a blanket. On exiting the bus, Jill seemed shocked and upset and told Teresa that Crawford had kissed her, fondled her breasts and placed his hand in her pants.

On or about May 2, Jill informed Teresa that she had broken-off the relationship with Crawford and told him she was acting at least partly on Teresa's recommendation. She said Crawford was furious and threatened to hurt Teresa; that he said he would break her nose and "take out her knees" so she would never play soccer again. Crawford told Jill that Teresa and teammate Liz Krall had urged her to break-off the relationship only because they "wanted him in a sexual way." Within an hour, Teresa received a call from Crawford, who angrily confronted her about having interfered with his relationship with Jill. He told Teresa he would not coach the team in the next game unless she "fixed things up" between him and Jill. An hour and a half later, he confronted Teresa again face to face on the practice field. When she told Crawford she was quitting the team, he said he would hunt her down and fix it so she would never play soccer again. Teresa went home distraught and told her parents Crawford had threatened her. She did not play in the team's match on Friday, May 3.

On Sunday, May 5, a soccer team parents' meeting was held in one family's home to discuss Coach Crawford. During the meeting, a call was received reporting that Crawford had a gun to his head and was threatening to pull the trigger. The police were called. City of Novi police officers responded and found Crawford at his home. They found him to be cooperative; they recovered an automatic pistol from his residence; and believing that he might be depressed and suicidal, they transported him to a local hospital for evaluation.

In the meantime, on May 4, Crawford had communicated his resignation to Clarke by e-mail. He was officially terminated by letter from Clarke on Monday, May 6, 2002, and advised that he was prohibited from entering onto high school property. Teresa transferred to a different high school for her senior year.

Plaintiff Teresa Henderson commenced this action in the Eastern District of Michigan on July 24, 2003. Named as defendants are Walled Lake Consolidated Schools, Walled Lake Western High School, Russell Todd Crawford, Principal Lawrence Barlow, Assistant Principal Kevin Clarke, Athletic Director David Yarbrough, and School District Superintendent James Geisler. Plaintiff's amended complaint contains 10 counts, including claims for sexual harassment and sex discrimination, in violation of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. §§ 37.2101 *et seq*., and Title IX, 20 U.S.C. §§ 1681 *et seq*.; civil rights claims under 42 U.S.C. § 1983, alleging denial of due process and equal protection; tort claims for assault, gross negligence, intentional infliction of emotional distress and slander; and claims for violations of plaintiff's rights under Michigan's Constitution.

---

[3]Teresa did not, apparently, receive any medical attention in connection with this incident. In fact, she did not even report the overdose to her parents until April 24. She later received counseling for depression from a social worker.

All defendants but Crawford moved for summary judgment after the close of discovery.[4] The motion was granted in its entirety on August 23, 2004. In a 29-page opinion, the district court thoroughly analyzed plaintiff's claims against the moving defendants and explained why it found them wanting. The district court denied plaintiff's motion to alter or amend its judgment on November 10, 2004. The district court dismissed the outstanding claims against Crawford without prejudice on May 10, 2005, and plaintiff timely filed notice of appeal. Plaintiff-appellant Henderson challenges the district court's ruling on most but not all of her claims. She insists the record presents genuine issues of material fact that warrant a trial.

## II. ANALYSIS

### A. Standard of Review

The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id*. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2005). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id*.

### B. State Law Sex Discrimination Claims (Elliott-Larsen Civil Rights Act)

#### 1. Quid Pro Quo Harassment

Plaintiff's count I sex discrimination claim is brought under Michigan's Elliott-Larsen Civil Rights Act, which provides a cause of action for sexual harassment interfering with an individual's education. The claim is based on two theories of sexual harassment, *quid pro quo* harassment and hostile environment harassment.[5] As a threshold matter, to make out a claim of *quid pro quo* sexual harassment, plaintiff is required to show that she was subjected to unwelcome sexual advances, requests for sexual favors, or conduct or communication of a sexual nature. M.C.L. § 37.2103(i); *Corley v. Detroit Bd. of Educ.*, 470 Mich. 274, 279 (2004). Plaintiff relies on the last of these, "conduct or communication of a sexual nature." She contends she was threatened with harm by Crawford if she disclosed his relationship with Jill Byrd and if she failed to facilitate a reconciliation of their relationship.

---

[4] Defendant Crawford did not participate in the proceedings below after filing an answer to the original complaint. The district court was advised by the parties that he had filed a bankruptcy petition, triggering an automatic stay of proceedings against him. The district court issued an order administratively closing the case against Crawford on September 30, 2004, and finally dismissed plaintiff's claims against him without prejudice on May 10, 2005. The claims against Crawford thus play no role in this appeal.

[5] To the extent count I also includes an allegation under M.C.L. § 37.2302(a), to the effect that plaintiff was discriminated against in her enjoyment of public accommodations because of sex, the district court correctly ruled that the viability of such a claim depended entirely on and was dictated by analysis of plaintiff's *quid pro quo* and hostile environment theories of sexual harassment. The district court did not, therefore, evaluate the public accommodations claim independently, but held that it must fall for the same reasons as the *quid pro quo* and hostile environment claims. Plaintiff's contention that the district court erroneously held that M.C.L. § 37.2302(a) was not applicable is a mischaracterization of the court's ruling. We find no error in the district court's analysis.

The district court noted that "sexual nature" has been interpreted strictly by the Michigan Supreme Court, citing *Corley* and *Haynie v. Dep't of State Police*, 468 Mich. 302 (2003). Consistent with these authorities, the court ruled that the threats and demands complained of by plaintiff did not involve sexual innuendo or any other type of sexual communication. Although these communications represented an abuse of authority, the court held they did not, in the words of *Corley*, "*inherently* pertain to sex." 470 Mich. at 279. The fact that the threats related to Crawford's relationship with Jill was deemed not to render the threatening conduct and communications directed at Teresa inherently sexual.

The district court's reasoning is sound and is supported by the Michigan case law. In *Corley*, closely analogous facts were presented. Reversing the Michigan Court of Appeals, the *Corley* court held that the defendant's "alleged threats that he would fire plaintiff if she interfered with his new relationship were not inherently sexual in nature," even though the communications arguably stemmed from the defendant's past intimate relationship with the plaintiff. *Id*. at 279-80. The court made it clear that "[v]erbal or physical conduct or communication that is not sexual in nature is not sexual harassment." *Id*. at 280. In *Haynie*, the court applied a similarly strict interpretation of sexual harassment, holding that even though "*harassment* based on pregnancy may constitute *discrimination* based on pregnancy, and thus sex *discrimination*, harassment based on pregnancy that is not at all sexual in nature simply is not sexual harassment." *Haynie*, 468 Mich. at 310 (emphasis in original).

Plaintiff's attempts to distinguish *Corley* and *Haynie* from the instant facts are weak and unavailing. Notwithstanding evidence of Crawford's sexually harassing conduct toward *other* team members, plaintiff simply has failed to demonstrate that *she* was subjected to conduct or communication of a sexual nature. This failure to adduce any evidence supporting an essential element is fatal to her *quid pro quo* claim under the Michigan Elliott-Larsen Civil Rights Act.

Finding no Michigan case law support for her claim, plaintiff appeals to case law from other jurisdictions addressing *quid pro quo* claims under Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e. Indeed, Michigan courts consider federal case law interpreting Title VII to be persuasive, albeit not binding, authority on issues brought under the Elliott-Larsen Civil Rights Act when the language of the two civil rights acts is substantially similar. *Pena v. Ingham County Road Com'n*, 255 Mich. App. 299, 311 n.3 (2003). In this instance, it is readily apparent that the required "substantial similarity" is lacking with respect to the specific issue presented.

Plaintiff relies on *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304 (2d Cir. 1986), and *Toscano v. Nimmo*, 570 F. Supp. 1197 (D. Del. 1983). Both cases recognized the viability of a Title VII *quid pro quo* sexual harassment claim even in the absence of evidence that the plaintiff was subjected to unwelcome sexual advances or other conduct or communication of a sexual nature. They recognized that a plaintiff subjected to disparate treatment because another person received preferential treatment for having granted coerced sexual favors is a third-party victim of sexually harassing conduct. In each case, however, the court, in evaluating the contours of a Title VII sexual harassment claim, explicitly relied on an Equal Employment Opportunity Commission guideline, 29 C.F.R. § 1604.11(g):

> Where employment opportunities or benefits are granted because of an individual's submission to the employer's sexual advances or requests for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who were qualified for but denied that employment opportunity or benefit.

*DeCintio*, 807 F.2d at 307; *Toscano*, 570 F. Supp. at 1199. This guideline language expressly obviates any requirement that the complained-of sexually harassing conduct be directed at the claimant to be actionable by him or her as a form of sex discrimination under Title VII.

In this respect, the scheme established under Title VII is directly at odds with the language of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2103(i), as recently and specifically construed by Michigan's highest court. Although the definition of "sexual harassment" set forth in M.C.L. § 37.2103(i) is substantially similar to the definition found at 29 C.F.R. § 1604.11(a), the Michigan Legislature has not adopted the guideline set forth at 29 C.F.R. § 1604.11(g). Further, in *Corley*, the Michigan Supreme Court expressly rejected the notion that a sexual harassment claim under the Elliott-Larsen Civil Rights Act could be premised on conduct other than conduct of a sexual nature directed at the claimant. In so ruling, the *Corley* court's majority rejected the dissent's suggestion to consult federal cases on the issue.

Plaintiff Henderson brought her sexual harassment claim under Michigan law, not federal law. In applying Michigan law, where we find that the "state's highest court has spoken to the issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us." *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997). Finding the instant facts materially indistinguishable from those presented in *Corley*, we are bound by *Corley*. Plaintiff's argument based on federal law must therefore be rejected and the district court's summary judgment for defendants on the *quid pro quo* claim must be affirmed.

### 2. Hostile Environment Harassment

In order to establish a claim of hostile environment harassment, plaintiff must prove the following elements by a preponderance of the evidence: (1) that she belonged to a protected group; (2) that she was subjected to communication or conduct on the basis of sex; (3) that she was subjected to unwelcome sexual conduct or communication; (4) that the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with plaintiff's educational opportunities or created an intimidating, hostile, or offensive educational environment; and (5) *respondeat superior*. *Chambers v. Trettco, Inc.*, 463 Mich. 297, 311 (2000). The district court was satisfied that plaintiff had adduced sufficient evidence on the first four of these elements to create triable fact issues. It is the fifth element, however, that was and is plaintiff's stumbling block.

*Respondeat superior* liability can be imposed on an employer for an employee's hostile environment harassment "only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action." *Id*. at 311; *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426 (2005). "[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Id*. at 426. Hence, actual notice is not required; "the test is whether the employer knew or should have known of the harassment." *Id*. We apply these standards in evaluating the *respondeat superior* liability of the school district.

It is undisputed that neither plaintiff nor any other soccer team member reported any concern about Coach Crawford's interactions with them to school administration officials. Plaintiff relies primarily on three items as justifying a finding that defendants had constructive notice that she was subjected to hostile environment harassment. First, she points to the meeting between Crawford and administration officials prompted by Jill Byrd's parents' concerns.

Second, she relies on evidence of inappropriate contact between Crawford and Jill on the team bench during soccer matches. Plaintiff's mother, Beth Henderson, attended all of the team's soccer matches. She often observed Crawford and Jill sitting side-by-side during games, looking at each other and talking and giggling together as though engaged in a "girlfriend/boyfriend relationship." Because the inappropriateness of this conduct was so obvious, she believed that Clarke, who was also present at the games in a good position to observe, could not have failed to notice.

Third, plaintiff relies on her mother's report to Clarke on May 2 that Crawford had sent an e-mail notice to team members at 4:00 a.m. that day, without copying Clarke, advising that practice was cancelled due to high winds and that the team would instead meet at his house. In response, Clarke made inquiry of the junior varsity soccer coach and confirmed that the varsity team was meeting at Crawford's house "watching videos," but took no further action. Plaintiff contends this report of several violations of the five-point memo put Clarke on notice of Crawford's blatant disregard for the memo and for the need to conform his behavior.

The district court addressed all three items explicitly and properly. First, the court viewed the administration's meeting with Crawford as evidence of defendants' reasonable and prompt response to actual notice of cause for concern. Yet, as the district court also observed, nothing among the concerns that prompted the meeting or the matters discussed at the meeting (*i.e.*, communications at odd hours, inappropriate counseling, unchaperoned off-campus activities, and inappropriate interactions with team members) hinted at the existence of a hostile environment. Although Jill Byrd's parents' concerns, coupled with the administration officials' meeting with Crawford, put defendants on notice of past inappropriate conduct that warranted correction, defendants' responsive measures (*i.e.*, the five-point memo and Clarke's ongoing monitoring of the coach and team at games and practices) appear to have been reasonably designed to address and remedy the concerns that had been raised.

As to the second item, the record is silent as to whether Clarke actually observed the reported inappropriate interactions between Crawford and Jill during soccer games. In his deposition, he appears not to have been specifically asked. He confirmed that he did attend games and practices and spoke with the team members almost daily to see how things were going. Clarke testified that the first time after the meeting he had notice of something amiss with Crawford was May 5, the evening of the parents' meeting and the report that Crawford had threatened suicide. This implies that he didn't observe anything "amiss" in Crawford's interactions with Jill during the games. Yet, for purposes of the summary judgment motion, the district court properly assumed that Crawford had observed the overly friendly behavior between Crawford and Jill during soccer games. The court nonetheless found these observations were insufficient to put defendants on notice that team members were subjected to a sexually harassing environment: "Crawford's possible physical relationship with Byrd, of which the school district may have had constructive knowledge, was not sufficient to have alerted school officials to the possibility of pervasively hostile behavior toward the larger group, including Plaintiff." Slip op. p. 19. Indeed, even if the game-time flirting between Crawford and Jill ought to have triggered further inquiry by Clarke, it can hardly support a reasonable finding that Clarke and other school officials should therefore have known that *another* team member, Teresa Henderson, was the victim of a hostile environment.

The district court also assigned little significance to Mrs. Henderson's reported concerns about the cancelled practice on May 2. Clarke did act on the report insofar as he contacted another coach to confirm there was a facially legitimate purpose for the team to meet to view films. To the extent that he ought to have investigated further and taken further disciplinary action, the district court observed that the situation unraveled so quickly thereafter that he did not have such an opportunity. First, there is no evidence that inappropriate interactions occurred between Crawford and team members during this team meeting at Crawford's home. Then, within a day after Mrs. Henderson's call, Teresa had quit the team and, within two days, on Saturday, Crawford had communicated his resignation. The May 2 report of Crawford's violations of the five-point memo instructions thus came too late to create a triable issue on the existence of such notice as would support imposition of *respondeat superior* liability on defendants.

In sum, the district court's evaluation of the record evidence was correct. Plaintiff has failed to adduce sufficient evidence to support an essential element of her hostile environment harassment claim and summary judgment was properly awarded to defendants.

### 3. Retaliation

In count I, plaintiff also alleges that defendants are liable under the Elliott-Larsen Civil Rights Act for Crawford's retaliation against her for having encouraged Jill Byrd to discontinue her inappropriate relationship with him.   To establish a *prima facie* case of retaliation, plaintiff must show:  (1) that she engaged in protected activity; (2) that this was known to defendants; (3) that plaintiff was subjected to adverse action by defendants' agent, Crawford; and (4) that there was a causal connection between the protected activity and the adverse action.  *Pena*, 255 Mich. App. at 310-11; *Meyer v. City of Center Line*, 242 Mich. App. 560, 568-69 (2000).

The district court correctly held that even if plaintiff's expressed opposition to Crawford's inappropriate relationship with Jill were deemed to constitute "protected activity," there was no evidence that defendants knew anything about it.  Neither is there evidence, even assuming that Crawford's angry threats constituted "adverse action," that such harassment was so sufficiently severe and pervasive as to have put defendants on constructive notice of it, such that their failure to respond would warrant imposition of liability on them.  *See Meyer*, 242 Mich. App. at 569-71.  This total lack of evidence of defendants' knowledge both of plaintiff's protected activity and of Crawford's retaliatory harassment fatally undermines plaintiff's retaliation claim.

Plaintiff argues on appeal that defendants should be subject to strict liability for Crawford's retaliatory actions, irrespective of their lack of knowledge.  The Michigan case law offers no support for this expansion of liability under the Elliott-Larsen Civil Rights Act.  The district court's judgment in this respect must therefore be affirmed.[6]

### C.  Sexual Harassment as Discrimination under Title IX

In count II of her first amended complaint, plaintiff alleges she was subject to sex discrimination in an education program which receives federal assistance, in violation of Title IX, 20 U.S.C. § 1681(a).  The district court recognized that Title IX is enforceable through a private cause of action for sexual harassment, but correctly held that defendants could be held liable in monetary damages for Crawford's misconduct only if they had actual notice of it and were deliberately indifferent.  *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).  Plaintiff insists on appeal that the record adequately supports a finding that Clarke had actual notice of Crawford's inappropriate relationship with Jill Byrd and, by failing to take adequate corrective action, demonstrated deliberate indifference.

For the reasons stated above, plaintiff is plainly wrong.  Jill Byrd is not a plaintiff in this action.  As the district court observed, even if Clarke had constructive notice of Crawford's inappropriate interactions with Jill, this in no way translates into actual notice of widespread harassment such that Clarke can be deemed to have actually known that plaintiff was subject to a hostile environment.  No team member ever complained.  All in all, less than a month passed between Jill's parents' complaint in early to mid-April (*i.e.*, defendants' first notice of concerns, to which they responded promptly and reasonably) and Crawford's termination in early May.  There is no evidence that any administration official had actual notice of widespread misconduct by Crawford during that time.  It was not until after Crawford had actually resigned that the extent of his misconduct became known to administration officials. The district court did not err; summary judgment on the Title IX claim must be upheld.

---

[6]Under the umbrella of her retaliation claim, plaintiff also argues that defendants should be liable for Crawford's conduct in requiring her to aid and abet his harassment of Jill Byrd by acting as "look-out" while he molested her under a blanket on the team bus.  In this regard, too, the district court correctly held there was no evidence of defendants' knowledge of this conduct and therefore no basis for holding them liable.

### D. Federal Civil Rights Violations

In count III, plaintiff alleges under 42 U.S.C. § 1983 that defendants' actions resulted in the denial of her constitutional rights to equal protection and due process. The district court awarded summary judgment to defendants on both claims. The district court rejected plaintiff's equal protection claim, finding that she had produced no evidence that school district officials had treated her differently than male students in any respect. In rejecting plaintiff's claim that defendants had violated her right to personal security and bodily integrity without due process, the court noted the lack of evidence that Crawford's misconduct had been perpetrated pursuant to official policy or with the tacit authorization of his superiors, essential elements of § 1983 liability. *Doe v. Claiborne County*, 103 F.3d 495, 507, 513 (6th Cir. 1996). *See also Doe v. City of Roseville*, 296 F.3d 431, 439-41 (6th Cir. 2002). On appeal, plaintiff does not distinguish between her equal protection and due process claims, but merely insists that evidence of defendants' deliberate indifference is sufficient to warrant a trial on her § 1983 claims. While evidence of deliberate indifference in the face of widespread abuse may indeed establish a policy of inaction and tacit authorization, the instant record, as detailed above, simply does not substantiate a finding of deliberate indifference. Summary judgment was properly awarded to defendants on the § 1983 civil rights claims.

### E. Gross Negligence

For purposes of tort liability under Michigan law, "gross negligence," for which governmental actors are not immune from liability, is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(7). For the same reasons that plaintiff's evidence of deliberate indifference was found wanting, the district court also determined that plaintiff failed to make out her count VIII claim that defendants were grossly negligent in failing to prevent Crawford's misconduct. Indeed, absent evidence that defendants knew or should have known that plaintiff was subject to a hostile environment, their failure to take better precautions can hardly be deemed to evidence recklessness or a substantial lack of concern for whether she sustained injury. Plaintiff has failed to demonstrate error in the district court's evaluation of the record.

### F. Slander

Plaintiff contends on appeal that the district court did not properly dispose of her count VII slander claim. This argument highlights genuine confusion in the lower court proceedings.

The slander claim is based on the allegation that Crawford told Jill Byrd that Teresa urged her to break-off their relationship only because Teresa herself wanted Crawford sexually. When the district court granted summary judgment to defendants, it did so without mentioning the slander claim. This is understandable, since defendants' motion did not challenge the claim. In fact, the motion is not addressed to several of plaintiff's other state tort claims either, *i.e.*, the gross negligence claim against Crawford specifically (count IV), the assault claim (count V), and the claim for intentional infliction of emotional distress (count VI). The moving defendants construed these claims as having been asserted only against Crawford, not the school district defendants. In her response to the motion, plaintiff explicitly denied defendants' asserted construction of her complaint, explaining that the assault, intentional infliction of emotional distress, and slander claims were brought against the school district defendants as well as Crawford, based on *respondeat superior* liability.

The district court ignored this pleading dispute and, in its summary judgment ruling, simply granted defendants' motion without spelling out all the claims on which judgment was awarded to defendants. On its face, the summary judgment order has no impact on the slander claim or the other common law tort claims. Plaintiff's ensuing motion to alter or amend the court's judgment therefore

raised the outstanding need for a ruling on the tort claims against the moving defendants, because their motion for summary judgment did not challenge them.

Before ruling on the motion to alter or amend, the district court, on September 30, 2004, issued its "Order of Removal of Action as a Pending Matter." This order purported to close the case "for statistical purposes" based on the district court's implied understanding that the only claims not resolved by its summary judgment ruling were those brought against defendant Crawford, claims which were then subject to the automatic bankruptcy stay.

The district court confirmed this understanding when it denied the motion to alter or amend its summary judgment ruling on November 11, 2004. The court's response to plaintiff's inquiry about the outstanding emotional distress, assault and slander claims against the school district officials consists of one sentence: "The court did not address this argument [that the common law tort claims in counts V, VI and VII were asserted against the school district officials pursuant to *respondeat superior* liability] specifically because it did not rely on the doctrine of *respondeat superior* in determining that the school district officials did not have notice." Order denying motion to alter or amend, p. 14, JA 98. In other words, the district court implied that it had awarded summary judgment to the school district officials on the tort claims – even though they had not moved for it – based on a lack of evidence that they had notice of Crawford's tortious conduct.

No further action was taken in the district court until the case against defendant Crawford was re-opened on April 25, 2005, after the bankruptcy stay was lifted. At a status conference less than two weeks later, plaintiff orally moved to voluntarily dismiss her claims against Crawford without prejudice, which motion was granted. On appeal, plaintiff has not chosen to pursue the emotional distress and assault claims, but only the slander claim. She contends the district court erred (1) procedurally, by awarding defendants judgment on a claim for which they had not moved for summary judgment; and (2) substantively, by awarding judgment on a basis (*i.e.*, lack of notice) that finds no support in the case law. Defendants do not directly respond to either of these arguments, but urge the court to affirm the judgment based on immunity and other grounds.

In this regard, plaintiff's claim of error is well-taken. Defendants did not seek summary judgment on the slander claim; the district court refrained from construing the first amended complaint as not stating a valid slander claim against the school district and administration officials; and, as discussed below, employer notice, the ultimate basis for the district court's disposition of the claim, is not an essential element of *respondeat superior* liability for an intentional tort, like slander, under Michigan law. The district court mishandled the slander claim. Yet, we may affirm on other grounds, as long as the opposing party is not denied the opportunity to respond to the new theory. *Carver v. Dennis*, 104 F.3d 847, 849 (6th Cir. 1997).

"The elements of a cause of action for libel are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication." *Linebaugh v. Sheraton Michigan Corp.*, 198 Mich. App. 335, 338 (1993). Under Michigan law, "words imputing a lack of chastity to any female or male are actionable in themselves." M.C.L. § 600.2911(1).

Yet, even if Crawford's actions might reasonably be deemed to satisfy all four of the above elements, his employer can be liable in *respondeat superior* only if his slanderous statement was made while he was engaged in his employer's work *and* was acting within the scope of his authority. *Dortman v. ACO Hardware, Inc.*, 405 F.Supp.2d 812, 825-26 (E.D. Mich. 2005). An employer is not liable for a defamatory statement, even though made in the workplace, if the statement was not made in relation to a matter about which the employee's duties required him to act. *Id*.

Here, the factual record surrounding Crawford's alleged slander appears to have been fully developed. Plaintiff's allegations are not materially disputed. Viewing the record in the light most favorable to plaintiff, there simply is no way that Crawford's angry remark to Jill Byrd about plaintiff's ulterior motive for urging the break-up of their relationship can be deemed to have been made within the scope of his authority as soccer coach. Granted, it was a statement made by Crawford to one of his team members about another. But it had nothing to do with coaching soccer and everything to do with purely personal interests and relations.[7]

Hence, we conclude as a matter of law that Crawford's remark was not made within the scope of his authority as soccer coach. On this essential element of plaintiff's slander claim, there is no genuine issue of material fact. It follows that Crawford's superiors, defendant school administration officials, cannot be held liable in *respondeat superior* for his slander and are entitled to summary judgment on plaintiff's claim against them. The district court's mishandling of the slander claim did not affect the substantial rights of the parties and is properly treated as harmless error. *See* Fed. R. Civ. P. 61. Accordingly, summary judgment for defendants on the slander claim will be affirmed on grounds other than those relied on by the district court.

## G. Adverse Inference Presumption

Plaintiff also contends the district court erred by failing to draw an inference adverse to the defendants based on their unexplained failure to produce the "missing" soccer file which was undisputedly under Clarke's exclusive control. *See* n.2, *supra*. Plaintiff speculates that the file may have contained information bearing on the reasonableness of defendants' actions, information relevant to the notice element of her claims. She argues that if the district court had properly applied the inference, it would have helped establish triable fact issues. The district court refused to invoke the inference because there was no evidence of fault in defendants' failure to produce the file and because the negative inference urged by plaintiff is a mere "hunch" unsupported by other corroborating evidence.

The district court did not err. Under Michigan law, a *presumption* that nonproduced evidence in one party's control would have been adverse to that party applies only where there is evidence of intentional fraudulent conduct and intentional destruction of evidence. *Ward v. Consolidated Rail Corp.*, 472 Mich. 77, 85-86 (2005). Absent evidence of intentional wrongdoing, the adverse inference is not presumed, but the finder of fact *may* be *permitted* to draw an adverse inference. *Id*.

The parties differ as to whether the unexplained loss of the soccer file represents a reasonable excuse for its nonproduction. Yet, there is absolutely no evidence of intentional wrongdoing. There is, therefore, no basis for application of the adverse inference presumption. Furthermore, considering the entirety of the record and the dearth of evidence of defendants' knowledge of Crawford's deviant propensities and behaviors, the district court cannot be faulted for concluding that any *permissible* adverse inference was not warranted or would not have made a difference in a reasonable jury's assessment of the evidence. Plaintiff's argument for the adverse inference simply lacks factual and legal support. It fails to persuade that the district court erred or that its award of summary judgment should be disturbed in any way.

---

[7]During oral arguments in this appeal, plaintiff's counsel was specifically given the opportunity, but failed to identify how the slanderous remark could be deemed to have been made within the scope of Crawford's authority as soccer coach.

**H. Ruling on Rule 59(e) Motion**

Finally, in a patently frivolous argument, plaintiff argues the district court erred when it ruled on her motion under Fed. R. Civ. P. 59(e) to alter or amend its summary judgment ruling. She argues the district court reviewed its ruling only for "palpable defect," the standard prescribed by local rule for a motion for reconsideration. Instead, she argues the court should have reviewed its own summary judgment ruling *de novo*, citing *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1047 (6th Cir. 2001).

*Cockrel* prescribes the standard of review applied by *this court* in reviewing a lower court's denial of a motion to alter or amend its order granting a motion for summary judgment. In applying such *de novo* review, the appellate court applies the same standard of review that the district court was required to apply. *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999) (cited with approval in *Cockrel*, 270 F.3d at 1047). A district court may grant a Rule 59(e) motion to alter or amend judgment only if there is: "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005). This standard is not inconsistent with the "palpable defect" standard applied by the district court pursuant to local rule. The district court did not err.

Moreover, even if the district court had reviewed its own ruling *de novo*, a different outcome would not have resulted, as evidenced by the entire foregoing analysis, which applies *de novo* review to the summary judgment ruling.

### III. CONCLUSION

In the end, this much is clear: Crawford is a troubled man who said and did bad things that undoubtedly caused harmful stress in plaintiff Teresa Henderson's young life. This is unfortunate. The record evidence, however, simply does not substantiate any of the legal claims asserted against the school district and school administration defendants. The record shows that administration officials acted reasonably when they received notice of Crawford's misconduct. Accordingly, based on the foregoing reasoning, the district court's award of summary judgment in favor of defendants-appellees is **AFFIRMED**.