NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0405n.06

No. 11-4416

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 24, 2013*
DEBORAH S. HUNT, Clerk

MPDS MEMPHIS LTD., dba Emerald Overlook
Apartments,

    **Plaintiff-Appellant,**

v.

STATE FARM FIRE AND CASUALTY
COMPANY,

    **Defendant-Appellee.**

)
)
)
)
)
)
)
)
)
)
)
)
)

**ON APPEAL** FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

**O P I N I O N**

---

**BEFORE: NORRIS, GIBBONS, and DONALD, Circuit Judges.**

    **ALAN E. NORRIS, Circuit Judge.** Plaintiff MPDS Memphis, Ltd. ("MPDS Memphis")

owns an apartment complex in Cleveland and called Emerald Oaks Apartments ("the Property").

MPDS Memphis bought an insurance policy from defendant State Farm Fire and Casualty Company

("State Farm"), which covered both property damage and lost income. On February 29, 2008,

Cleveland suffered a major snow storm during which the Property's roof collapsed, causing

extensive damage to the building. After much back and forth, State Farm paid MPDS Memphis a

total of $1,088,877.87 for losses covered by the policy.

    Despite this payment, MPDS Memphis and its property manager, Windsor Realty and

Management, Inc.,[1] believed that they were entitled to more money and therefore filed suit in the

Cuyahoga County Court of Common Pleas. The complaint alleged breach of contract, breach of the

---

[1] Windsor Realty was dismissed below by stipulation and is not party to this appeal.

covenant of good faith, breach of fiduciary duty, negligent misrepresentation, and simple negligence. State Farm removed the matter to federal court based upon diversity jurisdiction. Thereafter, the district court granted summary judgment to State Farm on all claims.

## I.

Cleveland averages nearly sixty inches of snowfall a year. Unfortunately, on February 29, 2008, eighteen inches fell on the city, including on the flat roof of the Property, which collapsed. According to the declaration of Michael Priore, a fifty-percent owner and managing member of MPDS Memphis, twenty of the apartments on the upper two floors suffered water damage. In the end, thirty-seven units were rendered uninhabitable. The Property consists of two buildings: the one that suffered damage has seventy-two units; the other, forty-eight. MPDS Memphis acquired the Property in 1999 and replaced the roof at that time. As part of a routine maintenance program, the roof was aluminum-coated every two years. The last time this occurred was in 2006.

MPDS Memphis purchased its policy from State Farm in 2004. Before issuing its policy, State Farm inspected the Property, noting that "[b]oth apartment buildings show excellent maintenance and upkeep."

Among other things, the policy covers losses caused by the "weight of snow, ice or sleet." However, it excludes damage "directly or immediately" caused by "deterioration, hidden or latent defect or any quality in property [sic] that causes it to damage or destroy itself." With respect to loss of income, the policy covers "actual loss" for a period of twelve months.

According to Priore, he contacted his State Farm agent as soon as he learned that the roof was failing. In response, on March 4, adjusters Kim Clouse and Donna Frederick met Priore at the

Property. According to Priore, the only way onto the roof was through a hatch accessible by ladder. He climbed onto the roof but Clouse merely "stuck her head out of the opening and looked at the roof." In her declaration, Clouse states that "I . . . observed that the underlying roof sheathing was rotted in several areas where the ceilings had collapsed." She explained to Priore that "damage for rot, deterioration, and mold would not be covered under the Policy." She followed up that determination with a letter, dated March 6, denying coverage with reference to that policy provision.

On March 6, a contractor employed by MPDS Memphis contacted Clouse regarding emergency repairs. The policy provides for such coverage. In a letter dated March 10, Clouse reiterated that she did not believe that the policy would cover any damages and denied emergency coverage. She conceded that "the weather conditions did not allow a thorough inspection to be completed" but promised that she would reassess the situation "when weather permits."

Priore instructed his contractor to lay an emergency tarp over the roof to prevent further water damage. The contractor also pulled down some leaking ceilings, covered appliances, and attempted to dry out the floors. The bill for this effort was $50,000. State Farm initially denied coverage but later paid $18,000 towards it.

On April 8, Clouse re-inspected the roof and, according to her, "observed that there was no indication of storm-related damage, missing or blown off roofing materials, or holes in the roof from debris." She continued to deny coverage.

On May 28, 2008, MPDS Memphis faxed Clouse a report prepared by Craig Cohen, an engineering expert it had retained. The report concluded that heavy snow and ice caused damage to the roof. After speaking on the telephone with Cohen, Clouse decided that State Farm should hire

its own engineering consultant and retained O.C.A. Consultants. A report was then prepared by engineer Carl Kieffer. The report, dated July 19, concluded that "accumulation of ice and snow on this roof probably caused an abnormally high level of standing water on this roof," which leaked into the building at several areas of flashing. However, "[t]he weight of ice, snow, and water on the roof joists and supporting walls was not a factor in these roof leaks." The parties agreed to jointly hire a roof consultant, Rooftec, Inc. Its report, dated September 24, stated that "the ice storm caused the existing damage and leaking being experienced with the roof system." Despite this unequivocal statement, State Farm requested a supplemental report from Rooftec, which confirmed its earlier determination.

Finally, on October 8, Clouse "informed MPDS Memphis that State Farm agreed to pay for a full roof replacement and all necessary interior repairs." State Farm issued a check for $190,000 on November 25, 2008. According to Priore, because of these delays and the oncoming winter, the roof was not replaced until April or May 2009.

The interior repairs followed the roof replacement. State Farm paid MPDS Memphis $209,848.34 for internal repairs on March 9, 2009. According to Clouse, MPDS Memphis objected that this amount was short by $20,000. Priore denies that he gave her any such figure. He recalls telling Clouse that the amount was "grossly inadequate." In April 2009, Priore hired an insurance adjusting firm to evaluate interior damages. Its representative, Larry Sheldon, calculated a cost of $686,163.06, which was submitted to State Farm on July 9, 2009.

State Farm hired its own contractor. Jim Mitchell, who had replaced Clouse as the point person for State Farm, reported that his contractor had assessed the job and, based upon that

assessment, State Farm would approve payment of $604,145.23 for interior damages. Meanwhile, according to Priore, long-term tenants began to leave the Property and the overall occupancy rate was dropping. For that reason, Priore agreed to the amount offered "as long as State Farm would hold open some additional items that could be submitted once repairs were completed." In the end, State Farm paid an additional $12,199.68 in March 2011 for further repairs. The total amount paid for building repairs, less deductions, amounted to $825,257.87.

As mentioned earlier, the policy also provided coverage for lost income. MPDS Memphis concedes that State Farm paid full lost income coverage for the twelve-month period covered by the Policy. Because repairs took more than twelve months to complete, however, Priore asked that State Farm pay for lost income until all repairs were completed. On March 14, 2011, State Farm paid $131,073.09 for additional lost income. Ultimately, State Farm paid MPDS Memphis $263,650 for lost income.

## II.

On appeal, MPDS Memphis contends that the district court erroneously granted summary judgment on its counts for breach of contract and breach of the covenant of good faith.

In reviewing these assignments of error, we apply a de novo standard of review. *Henderson v. Walled Lake Consol. Sch. Dist.*, 469 F.3d 479, 486 (6th Cir. 2006). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Moreover, we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences its favor. *Henderson*, 469 F.3d at 487.

### A. Breach of the Covenant of Good Faith

MPDS Memphis contends that State Farm breached its duty to act in good faith towards its insured.

As the district court correctly noted, "an insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action against the insurer." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315 (Ohio 1983) (syllabus). However, "the mere fact that an insurer refuses to settle within the policy limits is not, in itself, conclusive of the insurer's bad faith and does not give rise to tort liability. In order to recover for the excess liability, the insured has the burden to show that the refusal to settle was not made in good faith." *Id.* at 1320. Even a negligent determination to deny a claim is not enough to establish bad faith. *Klein v. State Farm Fire & Cas. Co.*, 250 F. App'x 150, 156-57 (6th Cir. 2007) (citing *Hart v. Republic Mut. Ins. Co.*, 87 N.E.2d 347, 349 (Ohio 1949)). If an insurer can establish that it acted with "reasonable justification," there is no bad faith. *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994).

Applying this standard, the district court concluded that State Farm acted with reasonable justification in delaying payment under the terms of the policy. Among other things, State Farm sent an adjuster to the Property within days and, while her inspection was limited, she observed deterioration and rot to the roof. The following month, she inspected the roof again and confirmed that "the roof was soft from deterioration and there was no indication of storm-related damage."

In support of its decision, the district court looked to *Klein, supra*, for guidance. In *Klein*, the insured made a claim on his homeowner's policy after his roof was damaged by hail. As in the

instant case, the adjustor was unable to make a thorough inspection of the roof due to weather conditions. Nonetheless, he concluded that hail had not damaged the roof and denied coverage. We affirmed summary judgment for State Farm on plaintiff's claim of bad faith. In reaching this decision, we reasoned that State Farm's reliance upon its adjustor constituted, at most, bad judgment and "mere negligence, or bad judgment does not amount to a claim for bad faith against an insurer." *Klein*, 250 F. App'x at 157. There are obvious parallels between *Klein* and the instant case. In both, State Farm initially relied upon its claim representative.[2] Here, however, State Farm went beyond reliance on its adjustor by hiring its own consultant and then jointly paying for a third analysis. As the district court recognized, "State Farm reasonably relied on sufficient evidence that the roof was not covered, and when presented with sufficient evidence that the roof was covered, agreed to pay." Likewise, it reasonably delayed payment for interior damage until the roof was repaired and two bids for the repairs had been received.

After our own independent review of the record, we agree with the district court's conclusion that State Farm is entitled to summary judgment on MPDS Memphis's breach of the covenant of good faith claim.

B. Breach of Contract

In Ohio, a breach of contract claim includes the following elements: "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994) (citing 2 Ohio Jury Instructions (1993)).

---

[2]Whether or not the claims representative made an accurate assessment of the cause of the roof collapse is ultimately of little significance in analysis of the good faith issue.

The district court concluded that MPDS Memphis failed to fully perform and did not raise a genuine issue of material fact concerning State Farm's alleged breach of contract. While the court's opinion provides a detailed analysis of the bad faith claim raised by MPDS Memphis, its discussion of the breach of contract claim fails to address with any specificity the claims advanced by MPDS Memphis for additional, unpaid compensation due under the policy. The court simply observes, "Defendant paid significant sums for loss of income and physical damage as per the contract. Therefore, Plaintiffs have failed to establish a breach of contract." (Page ID 1294). It is true that State Farm has paid out a significant sum–$1,088,877.87–under the terms of the policy; that fact does not, however, preclude further recovery. Because the reasoning of the district court on the issue of breach of contract is inadequate to enable meaningful appellate review, we are obliged to remand for further development of the breach of contract claim.

Before remanding, we address two concerns. The first involves the district court's conclusion that MPDS Memphis did not fully perform under the contract because it did not timely provide documentation to support its claim for lost income. First, as MPDS Memphis concedes, under the policy it was entitled to compensation for lost income only for the first year after the loss was incurred. Generously, State Farm continued to pay compensation for lost income beyond that time because repairs had been delayed. Logically, one cannot fail to fully perform when the duty lies outside the terms of the contract, as it did here. Regardless, MPDS Memphis has conceded that it no longer makes any claim for lost income. Plaintiff brief at 57. Hence, the alleged dilatory response of MPDS Memphis to requests for records related to lost income does not preclude consideration of the breach of contract claim.

With respect to that claim, State Farm notes that MPDS Memphis accepted $604,145.23 for interior property damage and "it is undisputed that MPDS Memphis accepted this amount as full compensation for the interior property repairs." State Farm brief at 53. This assertion misrepresents the record. Mr. Priore stated, "I agreed to Mitchell's proposal of $604,145.23, *as long as State Farm would hold open some additional items that could be submitted once repairs were completed.*" (Page ID 960) (emphasis added). As for the citation to Mr. Sheldon's deposition, which State Farm cites for the same proposition, it no more supports State Farm's position than does Mr. Priore's declaration. (Page ID 415).

In its reply brief to this court and during oral argument, State Farm contends that MPDS Memphis failed to raise its claims for additional damages below. However, we note that MPDS Memphis made several claims in its memorandum in opposition to summary judgment, which included additional compensation related to interior damage, amounts for unpaid emergency repairs, and supervisory construction costs. Docket #45 (Page ID 937). Plaintiff also raised claims for consequential damages: the cost of retaining Mr. Sheldon's firm, attorney's fees, and expenses incurred as the result of a loan default, to name a few. These claims, whether ultimately viable or not, are supported by exhibits, such as Mr. Priore's sworn declaration and Mr. Sheldon's deposition testimony, that arguably raise genuine issues of material fact with respect to these contractual claims.

On remand, we anticipate that the district court will revisit the question of summary judgment with respect to breach of contract. We do not hold here that reconsideration is precluded. We simply find that the record is sufficiently muddled and the district court's opinion on this issue is too cursory for us to rule with any confidence. Thus, the district court should afford MPDS Memphis

an opportunity to present its remaining breach of contract claims and then determine whether these claims are supported by evidence sufficient to withstand summary judgment. We recognize, of course, that the viability of certain of those claims, particularly those respecting consequential damages, will be affected by our holding on the breach of the covenant of good faith claim.

## III.

The judgment of the district court is **affirmed** with respect to the claim for breach of the covenant of good faith and **reversed** with respect to the claim for breach of contract. The judgment is **vacated** and the matter **remanded** for proceedings consistent with this opinion.