**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0077n.06

Case No. 14-5807

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DONNA SAMUELS, | ) | **FILED**<br>Jan 26, 2015<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CORRECTIONAL MEDICAL SERVICES, | ) | KENTUCKY |
| INC. d/b/a CORIZON, INC., | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: MERRITT, STRANCH, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** This appeal arises from Donna Samuels' ("Samuels") suit against her former employer, Corizon, LLC ("Corizon"), formerly known as Corizon, Inc. and incorrectly identified in this action as Correctional Medical Services, Inc. Samuels alleges that Corizon discriminated against her in the terms and conditions of her employment because of her race and engaged in conduct that was harassing, discriminatory, and retaliatory, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.010 *et seq.* The district court granted Corizon's motion for summary judgment, finding that Samuels's race discrimination claim failed because she had presented no evidence of disparate treatment from similarly situated individuals who are not members of her protected class, and that her retaliation claim failed because she had

presented no evidence suggesting that Corizon's proffered reasons for any adverse employment action were pretextual. *Samuels v. Corr. Med. Servs., Inc.*, No. 12-CV-301-JMH, 2014 WL 2506466, at *6-8 (E.D. Ky. June 3, 2014). Samuels now appeals the district court's judgment on her retaliation claim. We **AFFIRM**.

**I.**

Corizon contracts with state, county, and municipal agencies to provide medical and dental services to incarcerated individuals. One facility at which Corizon provides these services is the Lexington-Fayette County Detention Center ("LFCDC") in Lexington, Kentucky. Corizon's employees at the LFCDC include registered nurses, licensed practical nurses, nurse practitioners, physicians, dentists, medical records clerks, and various administrative personnel. Corizon only staffs two medical records clerks at the LFCDC: one part-time employee, and one full-time employee. Both employees are supervised by the Health Services Administrator ("HSA"). Another third-party entity, Bluegrass Mental Health—Comprehensive Care ("Comp Care"), provides mental health services to inmates at LFCDC. Corizon's medical records staff maintains and stores medical records for all inmates at LFCDC, and Corizon is the custodian of these records.

Samuels, an African American, first worked for Corizon as a medical records clerk from April 4, 2005 to May 9, 2007, when she voluntarily resigned. Samuels returned to work for Corizon on November 19, 2007. During this second period of employment, Samuels was hired as an "as needed" medical records clerk. Samuels eventually became the part-time medical records clerk. During this time period, Samuels worked with one other full-time medical records clerk, Michelle Brown, and both clerks were under the supervision of the HSA. Brown is also African American. At the time of Samuels' rehire, the HSA was Jonathan Bowen.

When Corizon first hired Samuels, she attended the company's orientation program, during which she became familiar with Corizon's personnel policies and procedures as set out in a manual entitled "Corizon Employee Success Guide" ("Guide"). Each employee receives a copy of the Guide at the time of hire and an additional copy each time the Guide is revised. Accordingly, Samuels, as acknowledged through her signature, received copies of the Guide on the date of her rehire, November 19, 2007, and received her latest copy of the Guide on March 30, 2012.

Upon her rehire, Samuels also received and acknowledged that she read and fully understood the Medical Records Clerk Position Description. This Position Description was one of many Samuels would receive during the course of her employment with Corizon. According to the Position Description, her essential functions as a medical records clerk constituted the following: retrieving medical charts for all health care staff or clinics as requested; filing daily all currently used medical records; ensuring that charts are countersigned by a physician and checking charts for completeness; releasing information at the direction of the Medical Records Supervisor, Medical Director, or HSA; securing all active and inactive medical records; answering the telephone, taking messages, and making telephone calls; typing letters, reports, and memoranda; maintaining a roster or appointment book of scheduled appointments for on- and off-site appointments; ordering, receiving, and maintaining office supplies; adhering to safety and security policies and participating in disaster drills; demonstrating an ability to deal with and respond to stressful situations in a stressful environment; and maintaining regular and reliable attendance.

Additionally, the Position Description set forth performance expectations for medical records clerks, including, in relevant part: performance of all clerical duties related to the

assembling and maintaining of medical records; maintaining accountability for the location of any medical record on file; taking on direct responsibility to pull records and deliver for clinical use; re-filing medical records upon completion of use; pulling records and performing studies as requested by the Director of Nursing ("DON"); and completing reports and performing other duties as assigned by the HSA. Samuels admits that, as a medical records clerk, she was responsible for maintaining health records for the sick call, dental, and mental health clinics for the entire detention center. Samuels further admits that she was responsible for re-filing records and organizing the files. Samuels also concedes that her job duties included providing assistance to staff members in locating charts in the medical records department, and updating and filing medical records charts when they were returned from the clinic. Samuels testified, however, that in practice, health care staff members, rather than medical records clerks, were responsible for retrieving and signing out their own charts. Additionally, while she admitted to re-filing records, Samuels testified that she was not directly responsible for pulling records and delivering them for clinical use, as listed in the performance expectations section of the Position Description.

Samuels was evaluated on her job performance annually. On February 27, 2009, Samuels received an evaluation prepared by Bowen, which gave her an overall rating of "A"[1] and listed two areas for improvement: (1) "a need to communicate with administration when scheduling issues arise," and (2) "a need to communicate with peers when issues arise." Approximately a year later, on March 8, 2010, Samuels received another evaluation from Bowen, which again gave her an overall rating of "A" and listed the same areas of improvement as her 2009 evaluation. The evaluation also contained a Developmental Agreement which

---

[1]According to the evaluation form, a rating of "A" connotes that the employee's performance level is that "expected of [a] fully qualified person" and that the employee "[d]emonstrates consistent, competent[, and] solid performance." There is, therefore, no support for Samuels' claim on appeal that an "A" rating "meant that she fully understood her job duties. . . ."

provided that Bowen and Samuels agreed to work together for her benefit on the following areas: (1) "work to communicate issues that arise in sick call before they turn into bigger problems"; (2) "maintain clinic environment throughout the day in sick call"; and (3) "work together to find other ways to improve sick call flow."

Samuels received another annual job evaluation on March 7, 2011, from the new HSA, Ericka Burnside. Burnside is also African American. Like the prior two years, this evaluation assigned Samuels an overall rating of "A" and listed the same two areas in need of improvement. The evaluation also included a Developmental Agreement, which provided that Burnside and Samuels would agree to work for Samuels' benefit in the following areas: (1) "work to communicate issues that arise in the medical records area with administrator ASAP"; (2) "maintain records and keep the medical records area neat and orderly at all times"; and (3) "work together with all members of the health care team to help improve upon effective communication and decrease workload."

In April 2011, Patricia Tomlin became the new HSA. Beginning in August of 2011, employees in other areas of the detention center began submitting written complaints to Tomlin about Samuels and Michelle Brown, the other medical records clerk. These complaints largely concerned Samuels' and Brown's attitudes, communication skills, and general unwillingness to assist in retrieving medical records. Specifically, on August 2, 2011, Tomlin received an email from Crystal Shadd ("Shadd"), the Director of Comp Care, complaining that when Dana Mullins ("Mullins"), a case manager with Comp Care, sought help in locating a mislabeled file, Samuels and Brown were rude and refused to assist Mullins in locating the file. Shadd also noted that she had had similar problems with Samuels and Brown in the past. Two days later, on August 4, 2011, Mullins herself e-mailed Corizon to discuss the above-mentioned difficulty with Samuels

and Brown, and to report another instance that same day in which Samuels and Brown had refused to help her locate a requested file.

Subsequently, on August 11, 2011, Tomlin received another email from Shadd about an incident she witnessed between a dentist and both medical records clerks. Shadd reported that she observed the dentist ask for a specific chart, and neither Samuels nor her co-clerk assisted him in finding the record. Shadd noted that the dentist seemed frustrated with the lack of assistance, and, ultimately, Shadd volunteered to help him locate the chart. Thereafter, on August 16, 2011, Nicole Marinaro ("Marinaro"), a Corizon phlebotomist, emailed Tomlin detailing instances of Samuels' and Brown's rudeness and unprofessional behavior when Marinaro needed assistance with locating charts.

As a result of these complaints, Tomlin and Levin Jones ("Jones"), Corizon's Vice President of Operations, who is African American, verbally counselled Samuels on August 18, 2011. Afterward, Tomlin memorialized this discussion in a memorandum to Samuels, indicating that Samuels was "expected to treat all staff and departments with dignity and respect" and "to perform [her] job duties which include retrieving medical records when asked, and in a friendly and helpful manner." The memorandum specifically noted that Samuels was "expected to comply with [her] job description which [she] read and signed on 11/11/07 [and] which clearly defines [her] roll [sic] in retrieving medical records." Samuels refused to sign the memorandum, which was placed in her personnel file. Jones, however, explained to Samuels that the verbal counseling was not disciplinary action, and that the memorandum would be removed from her file after six months. Samuels admits that Jones' explanation was consistent with the Corizon Employee Success Guide, and that following her meeting with Tomlin and Jones, she understood that she was responsible for retrieving medical records.

Nonetheless, on September 29, 2011, Shanna Meyers, a Nurse Practitioner at the facility, submitted a letter of complaint detailing further instances of Samuels' and Brown's continued rudeness and general unprofessional behavior, their failure to assist staff members in locating charts, and their failure to follow the proper procedure for thinning medical records. Shortly thereafter, on October 3, 2011, Corizon received another email from Shadd, forwarding a complaint from Mullins. Specifically, Mullins reported an incident on September 26, 2011, where Samuels responded with negativity when Mullins asked her about a document placed in the Comp Care mailbox. Mullins also indicated that the continued negativity from Samuels made her loath to ask for assistance in locating charts in the medical records department.

After receiving these two additional complaints, Tomlin sought the advice of Human Resources Specialist Stephanie Good ("Good") as to whether these incidents warranted corrective disciplinary action against Samuels. Good advised Tomlin to talk to Samuels and get "her side of the story." In accordance with this directive, Samuels was not issued any disciplinary action; instead, Tomlin met with Mullins and Samuels together in her office and also directed Samuels to provide a statement setting forth "her side of the story." The day after the meeting, on October 4, 2011, Samuels submitted a written statement as directed, via facsimile to Good, in regard to the September 26, 2011 incident and other issues. According to Samuels' written statement and deposition testimony, Samuels was upset that Tomlin spoke with her in Mullins' presence about the September 26 incident. Samuels further noted in her statement that during the meeting, Tomlin stated "this has got to stop," that Samuels and Mullins had to work together, that she was "sick of this s—t," and that maybe Samuels needed to find another job.

Samuels' written statement also expressed that she felt harassed and discriminated against based on what were, to her, anonymous complaints. According to Samuels, when she

asked Jones during the August 18, 2011 meeting who made the complaints, Jones allegedly only stated there were a number of complaints and the complaints had come from "jail staff." Samuels apparently understood "jail staff" to mean correctional officers. Thus, according to Samuels' written statement, on September 28, 2011, she began her "own investigation" into the complaints by talking to Major Hill, "who is over the Medical Department at the jail." The next day, on September 29, 2011, a memorandum was distributed to all Corizon employees. The memorandum related to safety and security in the jail setting and specifically forbade "[a]ll Corizon staff" from leaving their assigned medical areas unless directed to do so by the HSA or the Director of Nursing. In her written statement, however, Samuels expressed her belief that the memorandum was actually directed at Samuels and her co-clerk in medical records as a form of retaliation because Samuels spoke with Major Hill.

Good followed up on the concerns Samuels expressed in her written statement. Among other things, Good directed Tomlin to revise and reissue the memorandum previously distributed to all Corizon employees to include an explanation to the staff why the memorandum was issued. Good also verbally counseled Tomlin about her use of profanity during her meeting with Samuels and Mullins. Tomlin complied with Good's directive on October 13, 2011, and revised the memorandum in regard to staff's movement in the facility by including an explanation as to why she was issuing the directive.

On December 8, 2011, Samuels filed an initial charge with the Equal Employment Opportunity Commission ("EEOC"), and amended that charge on January 26, 2012. Samuels alleged discrimination, harassment, and retaliation.[2]

---

[2]Specifically, Samuels alleged, in relevant part:

Meanwhile, the complaints against Samuels and Brown continued into 2012. On March 27, 2012, Kristin Malone ("Malone"), DON, went to the medical records department to request, for use by Malone and Tomlin, two copies of an individual's chart in order to complete an internal reporting process. Despite a request by a direct supervisor and the fact that "pulling records and performing studies as requested by the Director of Nursing" is expressly listed as a performance expectation in the Position Description for medical records clerks, Samuels refused to comply. Instead, Samuels stated that she and Brown could not make such copies without having a release, even though a release is not required for Corizon's internal use of the medical records.

As a result of this incident, and consistent with the policies in Corizon's Guide, Samuels received written counseling from Jones and Tomlin on March 29, 2012, for insubordination. According to the memorandum from Jones to Samuels memorializing the meeting, Jones and Tomlin reiterated Samuels' job responsibilities to her and again expressly noted that Samuels was "expected to comply with direct orders from [her] direct supervisor as well as medical providers and the director of nursing." Additionally, during this meeting, Jones and Tomlin provided Samuels with further written clarification of her job duties. Samuels refused to read or sign the memorandum. Samuels admits, however, that she was told to read and become familiar

---

> In August 15, 2011 [sic], I was written up by manager Trish Tomlin. I was told that my co workers had complained about me being rude and disrespectful. In September 29, 2011, we all received a letter stating that no Corizon employee is allowed to leave their assigned area or assigned job duties unless you have been directed to do so by the HAS/DON [sic]. I feel this letter was sent directly to me. On October 3, 2011, I sent in a formal complaint about racial discrimination to human resources. This was after my co-worker Donna Mullins [sic] (White) made a complaint about me. I believe that my manager was biased during the investigation since she told me in front of my coworker that she was sick of this shit and maybe I should find me another job. I also believe I am being retaliated against because I feel harassed and no one had responded to my complaint. . . .

with the job description because she was expected to perform all duties listed or face further action, including termination.

Additionally, on March 28, 2012, Tomlin directed Samuels and Brown that they were to stagger their lunch breaks and other breaks to ensure that one of them would be available at all times during working hours, 7:00 a.m. to 3:30 p.m., to pull charts as requested by the medical staff. Samuels refused to read or sign this latest memorandum. Samuels admits, however, that access to these medical records was necessary for the health care staff or clinics to provide care for inmates residing in the detention center, and that Tomlin and Jones explained that the directive was necessary so that someone in medical records could pull these records in the event that a medical provider needed a chart or information. Samuels remained free to schedule her lunch with other Corizon employees working outside of the medical records department.

Samuels also received a copy of her annual evaluation on March 29, 2012. Tomlin completed the evaluation and ranked Samuels as "substantially missing" a majority of the job goals. Samuels' evaluation noted that she failed to perform tasks outlined in her job description, failed to readily perform tasks assigned by her supervisor, did not work well with co-workers and contract staff, lacked a professional demeanor such that staff felt uncomfortable approaching her for requests, and failed to adapt to requests or changes that Samuels perceived as falling outside of her job duties. It also listed the following areas for improvement: "Needs substantial improvement in developing positive working relationships with co-workers, providers and other contract personal. Have received numerous complaints from co-workers, providers and other contract personnel regarding lack of helpfulness, negative attitude and unwillingness in help finding charts and answering questions." Despite the areas of improvement noted on the annual

review, Tomlin noted that Samuels had good attendance and Samuels still received a merit increase in pay on February 19, 2012.

On May 16, 2012, Samuels received a final written warning based upon two separate job performance issues, both of which arose on April 13, 2012. First, Samuels violated the Time and Attendance Policy by failing to speak directly to either Tomlin or Malone rather than leaving a message when calling out from work. Samuels acknowledged receipt and understanding of the time and attendance policy on April 1, 2010, which expressly notes that she had to speak to the HSA or DON when calling out from work. Samuels admits that she failed to call out properly by speaking to either Tomlin or Malone personally. Second, Samuels failed to notify Tomlin or Malone of a backlog of Releases of Information ("ROIs") and failed to create charts for thirty-six new inmates. During her deposition, Samuels testified that she did not believe that a backlog existed, but acknowledged that some ROIs had not been faxed per policy and also that thirty-six charts had not been created. Samuels also testified that, despite an offer to do so, she never followed up with Tomlin or Jones regarding either the attendance policy or the backlogs on ROIs and charts.

Following Tomlin's resignation on August 8, 2012, Malone served dual roles as both the DON and acting HSA until Corizon could hire Tomlin's replacement. On October 24, 2012, Malone received a written complaint from Donna Schwartz, a Registered Nurse, concerning the backlog of ROIs in the medical records department. ROIs provide the medical staff with pertinent information related directly to patient care. That same day, Good and Malone spoke with Samuels about the complaint and also discussed the backlog of ROIs and Medical Administration Records ("MARs"). At LFCDC, MARs provide a list of all medication administered to inmates. In response to their conversation and Malone and Good's request for a

statement, Samuels submitted another written statement to Good. In her written statement dated October 24, 2012, Samuels stated that the MARs were not included on the job description provided to her on March 29, 2012, and that the "extra" duties listed in that job description caused her and her co-clerk to get behind on the MARs. Again, to clear up any confusion with their express job duties, both Samuels and Brown were advised that MARs are, and had always been, a part of their job description, and they were directed to resolve the backlog immediately.

Gary Blair ("Blair") became the new HSA on October 29, 2012. As part of Blair's arrival at the LFCDC, he toured the complete facility and met with various staff members. While touring the medical records department, Malone and Blair discovered several boxes containing backlogs of MARs under various tables in the medical records department and took photographs to discuss the issue with Samuels and Brown. Blair and Malone met with Samuels on November 16, 2012. Blair mentioned that he was aware there had been issues about Samuels' job responsibilities and duties; accordingly, he provided Samuels with another clarification to her previous job description, again expressly noting Corizon's performance expectations of its medical records clerks. Blair reviewed the job description with Samuels in detail. Similar to former HSAs Bowen and Burnside, Blair also provided Samuels with a Development Plan to help address the backlog of MARs, organize ROIs, and improve overall communications with the medical staff. As part of the Development Plan, Blair also agreed that he and Malone would meet with Samuels on a weekly basis to help address the issues noted in the Development Plan. Samuels refused to sign the Development Plan.

On November 26, 2012, Blair and Malone had their first weekly meeting with Samuels to discuss progress on the items listed on the Development Plan, to receive input from Samuels on ways to meet the goals in the Development Plan and to discuss any issues or problems with

complying with the Plan. According to Malone's meeting notes, which Samuels did not deny the accuracy of during her deposition, Samuels refused to provide any strategy for getting caught up on the MARs backlog. Rather, Samuels insisted on returning to the purportedly changed job description in March 2012, and kept blaming the backlog on those changed duties instead of working with Blair and Malone to devise a plan to resolve the backlog.

Blair eventually had multiple meetings and counseling sessions with Samuels, yielding no improvement in her job performance. Ultimately, in light of all that had transpired over the preceding sixteen months, Blair recommended that Samuels' employment with Corizon be terminated. Following review of Blair's recommendation, Jones agreed, and Samuels was terminated on December 12, 2012. The EEOC dismissed Samuels' charge and issued a Right to Sue Notice on June 25, 2012. Samuels initiated her lawsuit against Corizon in the district court on September 21, 2012, prior to her termination.

## II.

We review de novo a district court's order granting summary judgment. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). The moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). We view factual evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).

**III.**

**A.**

In her complaint before the district court, Samuels alleged that she was a victim of disparate treatment by Tomlin because of her race. The district court, in granting Corizon's motion for summary judgment, addressed the merits of Samuels' disparate treatment claim, *Samuels*, 2014 WL 2506466, at *6-7, but also noted that Samuels, in her response in opposition to summary judgment, only argued that Corizon "violated the law by retaliating against her." *Id.* at *7 n.3. Accordingly, the district concluded that Samuels had "abandoned or waived any argument in support of her claims of discrimination on other grounds." *Id.* Likewise, on appeal, Samuels only challenges the district court's dismissal of her retaliation claim. Accordingly, we, like the district court, find that Samuels has abandoned or waived her disparate treatment claim. *See Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996).

**B.**

Title VII prohibits employers from retaliating against employees for opposing practices made unlawful by Title VII or for filing a charge of discrimination, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). Absent direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework governs claims of retaliation based on circumstantial evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). To establish a prima facie case of retaliation, Samuels must demonstrate: (1) that she engaged in a protected activity; (2) that Corizon had knowledge of her protected conduct; (3) that Corizon took an adverse employment action against her; and (4) that there was a causal connection between the protected activity and the adverse employment action. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

If Samuels offers sufficient evidence to support a prima facie case, the burden of production then shifts to Corizon to articulate a legitimate, non-retaliatory reason for its employment action. *Id.* at 526. The burden of persuasion, however, remains with Samuels at all times. *Id.* If Corizon articulates such a reason, Samuels must then show that the Corizon's stated reason "is merely a pretext for discrimination." *Id.* (internal quotation marks and citation omitted). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Samuels posits that she has satisfied the first prong of a prima facie case by having engaged in two activities protected by Title VII: the filing of her discrimination charge with the EEOC on December 8, 2011, and the filing of an "internal complaint" with her employer. The internal complaint to which Samuels alludes is the written statement she submitted to Good on October 4, 2011, in regard to the September 26, 2011 incident with Mullins and other issues. We decline to construe Samuels' October 4, 2011 statement as an internal complaint and, therefore, a protected activity. Samuels, relying on the Supreme Court's holding in *Crawford v. Metropolitan Government of Nashville & Davidson County, Tennessee*, is correct that an employee's filing of an internal complaint may constitute a protected activity under Title VII. 555 U.S. 271, 277-78 (2009) ("There is . . . no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.") *Crawford* stands for the proposition that Title VII's "opposition clause"

protects employees who oppose unlawful practices, regardless of whether the employee speaks on his or her own initiative or in response to employer questions. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 729-30 (6th Cir. 2014), *reh'g denied* (Apr. 2, 2014). Samuels' written statement, however, was not in the nature of a complaint.

We first note that, as Samuels expressly acknowledged in the statement, Samuels submitted the statement at Tomlin's behest. Both the written statement and the meeting between Tomlin, Samuels, and Mullins that preceded it were specifically intended to give Samuels the opportunity to explain "her side of the story." Nothing in the contents of Samuels' statement, nor the events that transpired afterwards, suggests that Tomlin took issue with anything Samuels said in her statement.

More importantly, while Samuels' statement specifically addressed issues with Mullins, what transpired during the meeting with Tomlin and Mullins, Samuels' "investigation," and Samuels' general frustration with her coworkers, the statement only vaguely asserts that Samuels was "being harassed, discriminated against and [suffered] some retaliation." Not once does Samuels suggest in the statement that she was being harassed, discriminated against, or retaliated against based on any protected characteristic, such as her race. If anything, the full context of the statement suggests that Samuels was being "harassed" because the complaints were, to her, anonymous; that she was being "discriminated" against because she felt her superiors were unfairly crediting the complaints of other employees; and that Samuels was "retaliated" against on account of the memorandum that was sent out the day after she initiated her "investigation" into the complaints, although the statement concedes that the memorandum was addressed to all Corizon employees.

Samuels' statement fails to connect any of these vague references to any protected status, and never mentions her race. Moreover, when Samuels subsequently met with Good to discuss her statement, she still did not complain that she felt she was being harassed or discriminated against because of her race. Accordingly, Samuels' October 4, 2011 statement to Human Resources does not amount to a protected activity. *See Willoughby v. Allstate Ins. Co.*, 104 F. Appx 528, 531 (6th Cir. 2004); *Offutt v. Warren County Reg'l Jail*, 109 Fed. Appx. 740, 743 (6th Cir. 2004) (per curiam). And insofar as the statement is not a protected activity, it is clear that this prong of the prima facie case is not satisfied.

We turn next to the question of whether Samuels established a prima facie case of retaliation based on the filing of her EEOC charge on December 8, 2011, which is unquestionably a protected activity under Title VII. At issue is whether Samuels established the three remaining prongs of the prima facie case and, following the steps of the *McDonnell-Douglas* analysis, then showed that Corizon's stated reasons for its employment actions were pretextual.

Samuels argues that "[t]he [t]rial [c]ourt erred in finding that [she] did not establish the essential elements of her retaliation claim" and "erred in not finding that [Corizon's] articulated reasons for the [a]dverse [e]mployment action were pretextual." Samuels' first argument misconstrues the district court's opinion. We assume that by alluding to the "essential elements" of her claim, Samuels is actually referring to the prongs of a prima facie retaliation claim. The district court did not find, however, that Samuels had failed a make out a prima facie case of retaliation. The district court assumed, but did not decide, that Samuels had established a prima facie case:

> Even if the Court were to accept that (1) the written counseling that she received
> in March 2012, the reduction in the number of hours on her work schedule in May

2012, the implementation of a development plan and scrutiny with respect to her performance under that plan in November 2012, and her termination in December 2012 were (2) adverse employment actions with (3) a causal connection to her complaints of discrimination to Corizon's human resources department in her letter of October 2011 and the EEOC complaint filed in December 2011(4) of which Defendant was aware, Plaintiff has not brought forth evidence to demonstrate that Corizon's stated legitimate, non-discriminatory reasons for these actions were pretextual.

*Samuels*, 2014 WL 2506466, at *8. Accordingly, the district court found that, irrespective of whether Samuels could make out a prima facie case, she had failed to establish that Corizon's actions were pretextual. The district court also did not fail to draw all reasonable inferences in Samuels' favor. We agree that Samuels has likely fulfilled the first two prongs of her prima facie case. However, it is less clear that the third prong is fulfilled.

Samuels' arguments as to what constitutes the adverse employment actions in this case have been something of a moving target. In her response to Corizon's interrogatories, Samuels alleged that after filing the written statement with Human Resources, Tomlin retaliated against her by: clarifying her job description; issuing the lunch directive; and reducing her work hours. In her response in opposition to Corizon's motion for summary judgment, Samuels alleged that Corizon retaliated against her by reducing her work hours and terminating her "shortly after" she "excercis[ed] her right to file complaints internally and with the EEOC." On appeal, Samuels argues Corizon retaliated against her by terminating her; reducing her work hours; and "den[ying] [her] the right to discuss her concerns with her co-workers" by "segregat[ing]" her and Brown "in the medical records office after she discussed the alleged complaints of the staff" with Major Hill. All of these arguments, when considered separately or together, are equally unpersuasive.

Samuels initially filed her EEOC charge on December 8, 2011. Samuels amended the charge on January 26, 2012. The EEOC issued its Right to Sue Notice on June 25, 2012.

Samuels was not terminated until December 12, 2012. Because Samuels was terminated after the EEOC issued its Notice of Right to Sue, the termination is not within the scope of Samuels' EEOC charge. Further, Samuels failed to amend her complaint to include her termination. As such, Samuels has failed to exhaust her administrative remedies, and cannot now argue that her termination constitutes an adverse employment action. 42 U.S.C. §2000e-5(e); *see also Williams v. Northwest Airlines, Inc.*, 53 Fed. Appx. 350, 351 (6th Cir. 2002) (exhaustion of administrative remedies is a condition precedent to a Title VII action). Moreover, Tomlin—whom Samuels repeatedly identifies as the person who retaliated against her—was no longer employed by Corizon at the time of Samuels' termination, and therefore played no role in her termination. Nevertheless, like the district court, we will assume for this analysis that Samuels has established the four prongs of the prima facie retaliation case. We hold that Corizon has satisfied its burden of establishing a legitimate, non-retaliatory reason for its employment action. *Zeidler*, 516 F.3d at 526. We turn to whether Samuels has satisfied her burden to show that Corizon's stated reasons were mere pretext.

We find that Samuels has failed to bear her burden of production or persuasion in establishing that Corizon's proffered reasons for any adverse employment actions after December 8, 2011, were pretextual.[3] Samuels offers no evidence to support her argument that the reduction in her work hours was for anything other than legitimate, non-retaliatory reasons. Corizon has presented evidence that, in early March 2012, it began negotiating renewal of its contact with the LFCDC. As part of this process, Corizon discovered that the contract only

---

[3]Because the district court assumed, but did not decide, that Samuels had established a prima facie case of retaliation, the district court considered any activity after October 2011 (when Samuels submitted her written statement to Human Resources) to determine whether it could constitute an adverse employment action. *Samuels*, 2014 WL 2506466, at *8 n.4.

permitted the part-time records clerk to work twenty-six hours per week. Samuels, the only individual holding this position at the LFCDC, was mistakenly permitted to work thirty hours per week instead of the contracted rate of twenty-six hours per week. Accordingly, Corizon contends that it reduced Samuels' hours from thirty to twenty-six in order to comply with the contract. Corizon argues, and Samuels does not dispute, that the reason for the change was communicated to Samuels, and she was instructed by Tomlin and Jones to meet with Tomlin to discuss her new schedule. Because Samuels failed to meet with Tomlin as instructed, Tomlin sent a letter to Samuels on April 12, 2012, indicating that she scheduled Samuels to work on the days that Samuels had been working, but with hours adjusted from thirty to twenty-six per week.

Accordingly, the only evidence presented establishes that Corizon made a legitimate, non-retaliatory business decision to reduce Samuels' hours based on its contractual obligations. Samuels offers nothing, other than speculation and her own subjective belief, that Corizon's "reason for reducing [her] hours after her complaints is also suspect." As the district court found, such unsupported assertions are insufficient to place the issue of pretext before a jury. *Samuels*, 2014 WL 2506466, at *8 (citing *McKinley v. Skyline Chili, Inc.,* 534 F. App'x 461 (6th Cir. 2013) (affirming summary judgment where EEOC's speculation that employer's reliance on performance problems was "plainly suspect" fell short of demonstrating pretext)).

Like her claim related to the reduction in hours, Samuels assertion that she and Brown were "segregated" in the medical records area because of Samuels' discussion with Major Hill is based on nothing more than speculation and her own subjective belief. To support her allegation that the lunch directive "requiring coverage of medical records during lunch operated to separate the two (2) African American employees from eating lunch together," Samuels relies solely on her subjective belief that "the purpose of the memorandum was clear in that it segregated the two

(2) African American employees from each other because of their complaints and because they questioned their treatment from Tomlin." Samuels and Brown, although both African American, were also the only two employees who worked in the medical records department. Samuels has admitted that she understood the purpose of the directive was to have coverage in the event that someone needed assistance with medical records and, thus, not to penalize Samuels for engaging in protected activity. Therefore, there is simply no support for Samuels' belief that requiring Samuels and her co-clerk to stagger their lunch to provide coverage of the medical records office during working hours was pretextual. Moreover, Samuels and Brown, although they could not take lunch together, were not "segregated" from each other during the rest of the workday. They also remained free to have lunch with other employees at LFCDC.

**IV.**

For the foregoing reasons, Samuels has not established any genuine issues of material fact as to her retaliation claim against Corizon. Samuels' disparate treatment claim is deemed abandoned or waived due to Samuels' failure to raise any arguments regarding this claim either before the district court or on appeal. Accordingly, the judgment of the district court is **AFFIRMED**.