NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0356n.06

Case No.14-1725

**FILED**
May 12, 2015
DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CARLOS BRIGGS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| UNIVERSITY OF DETROIT-MERCY, et al., | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendants-Appellees. | ) | |
| | ) | OPINION |
| | ) | |
| | ) | |

**BEFORE: KETHLEDGE and DONALD, Circuit Judges; McCALLA, District Judge.**[*]

**BERNICE BOUIE DONALD, Circuit Judge**. Plaintiff-Appellant Carlos Briggs sued

his former employer, the University of Detroit-Mercy ("UDM"), and its athletic director, Keri

Gaither ("Gaither"), for unlawful retaliation in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e-3(a), amongst other claims. On May 27, 2014, the district

court granted summary judgment in favor of UDM and Gaither. For the reasons stated herein,

we **AFFIRM**.

I.

On July 16, 2007, Briggs began working at UDM as one of three assistant coaches for the

men's basketball team. Briggs' responsibilities included daily coaching activities, recruiting

---

[*]The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

players, and occasional overnight travel. In Spring 2008, Gaither became Athletic Director. Her responsibilities included overseeing the basketball program, supervising Briggs' boss, the head basketball coach, and reporting to UDM's president. In August 2009, during a team exhibition trip to Spain, Briggs learned that Gaither was having an affair with another assistant coach, Derek Thomas. Briggs explained in his deposition that he did not report the affair because Gaither and Thomas were "two adults, . . . [Briggs] was not the morality police[,] . . . [and the affair was] on them, their husbands, wives, and God. PageID 1288. Briggs further explained that he had "nothing to do with that." *Id.*

Once Gaither's affair "started affecting the basketball team, [Briggs'] job, and things like that," however, Briggs allegedly reported Gaither's affair and conduct to the head basketball coach in 2010 and 2011.[1] PageID 1289. Specifically, Briggs felt that Gaither (1) rejected candidates that Briggs had identified for basketball scholarships so that candidates recruited by Thomas would face less competition for scholarships; (2) traveled with the team to away games so Thomas could illicitly "slip into [her] hotel room after the team's curfew, causing the players to leave their rooms to go stand outside the door to [her] room, giggling while they listened to the sounds of Gaither and Thomas apparently having sex;" (3) engaged in behavior that elicited outraged calls to Briggs from parents who were concerned about their sons' exposure "to Gaither['s] and Thomas' sexual conduct;" (4) openly showed favoritism to some players as a reward for their silence; and (5) unfairly punished other players who might be expected to divulge the affair or who were Briggs' recruits, including removing several players from the basketball program, resulting in their leaving UDM. PageID 13-14.

---

[1]Briggs was allegedly never advised whether the head coach took any action in response.

On August 26, 2012, Briggs disclosed his knowledge of Gaither and Thomas' affair as an "anonymous" reporter via UDM's web-based whistleblower tool. The whistleblower report stated, in pertinent part:

> I am [an] Assistant Men's Basketball Coach, one of three on our staff. We report to the Head Coach who reports to the Athletic Director [("AD")]. The Athletic Director has been having sexual relations with my fellow assistant [coach] Derek Thomas since our team trip to Spain in the summer of 2009. I know because Derek and I have been roommates on the road the whole time. Whenever the AD travels with the team I have the room to myself. The favoritism the AD shows Derek has caused a lot of difficulty and drag on our growth as a basketball program. The AD's resentment for me because she knows I know about their affair and because she resents my ability to recruit and do other work functions better than her lover threatens my job status. She has consistently acted to undermine me during the past year.

PageID 1426.

Steve Nelson, UDM's Associate Vice-President for Human Resources, responded by thanking Briggs for the report, and the next day asked that Briggs "provide more details to facilitate the investigation." PageID 1428. Briggs was initially hesitant, allegedly because he desired to remain anonymous. Nelson pointed out that by identifying himself as Derek Thomas' fellow Assistant Men's Basketball Coach, Briggs had already narrowed the possibilities to just two individuals, but nevertheless assured Briggs that UDM would protect him from any retaliation. Eventually, Briggs agreed to meet Nelson at a Tim Horton's restaurant on September 7, 2012 to discuss the whistleblower report.

After this face-to-face meeting with Nelson, Briggs alleges that UDM either directly or indirectly disclosed his identity to Gaither, resulting in (1) increased hostility and harassment by Gaither, and (2) Gaither falsely accusing Briggs of misconduct on the job.

UDM investigated the allegation contained in Briggs' whistleblower report but Gaither and Thomas denied any sexual relationship. UDM closed its investigation of Briggs' report on

September 15, 2012, and conveyed to Briggs that "appropriate action has been taken." PageID 1430. Dissatisfied with UDM's investigation and Gaither and Thomas' continued employment, on September 18, 2012, Briggs emailed Nelson and copied UDM's president, stating that the "lines of authority have been permanently compromised" and questioned whether there was "anywhere else [he] can go to get this cleaned up." PageID 750. UDM did not disclose the contents of its investigation but assured Briggs that "he would be fine and should just go back to work." PageID 16.

Meanwhile, Briggs' workplace conduct had caused concern and resulted in e-mail exchanges regarding his behavior, from as early as April 2, 2010. Specifically, Briggs' behavior on at least two occasions led to complaints that he threatened (1) a female Assistant Athletic Director as she tried to explain UDM's gasoline expense reimbursement procedures to Briggs; and (2) coaching staff from another school after they sent an e-mail complaining that Briggs had compromised the integrity of his UDM department by calling a fellow coach a "racist" and a "punk-ass" in public. PageID 617. Briggs' behavior was addressed in a Performance Improvement Plan ("PIP") that had been prepared in draft form with input from Briggs' supervisors and UDM's human resources department. The PIP was not formally presented to Briggs prior to his termination and the parties agree that the PIP was "not being compiled with the intent of firing Briggs." PageID 1221, 1224.

On October 10, 2012, UDM's Head Women's Basketball Coach, Autumn Rademacher, complained to UDM that Briggs interfered with her ability to obtain a head coaching job at Eastern Michigan University ("EMU"). On October 14, 2012, UDM received a complaint from Mort Meisner, head of UDM's PR contracting firm, that Briggs had threatened and/or assaulted Mort Meisner and his daughter at a UDM facility on October 12, 2012. Nelson met with Briggs

to discuss the complaints. Briggs denied interfering with Rademacher's EMU job and denied threatening/assaulting Mort Meisner and his daughter. In investigating Rademacher's complaint, UDM reviewed cell phone activity from work-issued phones in the athletics department. In the course of that investigation, UDM inadvertently discovered text messages that proved Gaither and Thomas' affair, and decided to quickly act on the information.

Within a few days, on October 31, 2012, UDM advised Thomas and Gaither that their employment would be terminated, and Gaither, given her 29-year tenure at UDM, opted instead to voluntarily retire. The following day, on November 1, 2012, UDM terminated Briggs' employment. The termination letter specified that "[t]he grounds for the termination are that [Briggs] acted in a threatening manner toward Mort Meisner and his daughter on the evening of October 12, 2012 at Calihan Hall, and that [Briggs] attempted to interfere in an employment opportunity that Autumn Rademacher had at Eastern Michigan University." PageID 746.[2]

## II.

Upon his termination, Briggs sued Gaither, UDM and its PR contractors, Mort Meisner Associates, Inc., and its president, Mort Meisner (collectively "Meisner") in state court for money damages based on six claims, including that UDM discharged him in unlawful retaliation under Title VII. After removing the case to federal court, Gaither/UDM and Meisner moved separately for summary judgment.

The district court granted Meisner's motion for summary judgment, dismissing each of Briggs' claims against Meisner in piece-meal fashion in orders dated August 28, 2013, May 7, 2014, and June 16, 2014. Briggs appealed only the May 7, 2014 order and specified that he "challenges only that aspect of the district court's May 7, 2014, Opinion and Order that related to

---

[2]Briggs' termination letter reminded him that he could be terminated with or without cause, as per the terms of his employment agreement, but that the specified grounds were sufficient cause to warrant termination. Therefore, Briggs was terminated for cause.

Briggs' defamation claim." Appellant's Br. 6, fn. 5. In particular, Briggs disagrees with the district court's finding that Briggs was a limited purpose public figure and failed to meet his evidentiary burden to show that Meisner had acted with the requisite malice to be liable for defamation. Appellant's Br. 3.

Gaither/UDM's motion to dismiss, which was construed as a summary judgment motion because of its attached exhibits, argued that Briggs did not make a prima facie case of Title VII retaliation because he failed to demonstrate two necessary elements (1) that he engaged in protected activity under Title VII, and (2) that there was a causal connection between such activity and his termination.

Before the district court, Briggs opposed Gaither/UDM's motion as to his state law retaliation claim but did not discuss his Title VII retaliation claim at all. The district court noted that "[b]y failing to present any argument or evidence supporting his Title VII retaliation claim in his response, [Briggs] has forfeited any argument that summary judgment on that claim is inappropriate." PageID 1798 (citing *Brown v. Gojcaj Foods, Inc.*, No. 09–14537, 2011 WL 1980533, at *3 (E.D. Mich. May 20, 2011)). Nevertheless, the district court considered the facts on record before determining that "[n]o reasonable jury could find that when Plaintiff reported Gaither and Thomas's relationship, and the resulting favoritism of Thomas, he had a reasonable and good faith belief that he was reporting Title VII sex discrimination or sexual harassment," and that Gaither/UDM was entitled to judgment as a matter of law. PageID 1799. Accordingly, the district court granted summary judgment in favor of Gaither/UDM as to all six claims on May 27, 2014. Briggs appealed the decision challenging "only that aspect of the district court's May 27, 2014, Opinion and Order that related to his claim for Retaliation in Violation of Title VII." Appellant's Br. at 8, fn. 6, and at 37, fn. 11.

After Briggs' appellate briefing was filed, Meisner was dismissed from this appeal pursuant to a stipulation on October 27, 2014. On the same day Gaither/UDM filed its appeal brief which addressed the district court's May 7, 2014 order granting summary judgment to Meisner and its underlying findings with respect to Briggs' defamation claims. Gaither/UDM's inclusion of this argument appears prophylactic and ultimately unnecessary because (1) Briggs' defamation arguments on appeal are directed only at Meisner, who was subsequently dismissed from the appeal; (2) Briggs does not argue that UDM was liable for Meisner's allegedly defamatory statements; and (3) Briggs does not challenge the district court's May 27, 2014 decision as to UDM's liability for Meisner's alleged defamation.[3]

Accordingly, we review only the district court's May 27, 2014 order granting summary judgment to Gaither/UDM and limit our review, as requested by Briggs, to his Title VII retaliation claim. Briggs now argues that (1) he did not forfeit any argument against summary judgment of his Title VII retaliation claim, and (2) the district court's analysis preceding its grant of summary judgment was inadequate. We consider each of his arguments in turn.

III.

We review a district court's grant of summary judgment de novo. *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party is entitled to summary judgment *if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any*, show that there is no genuine issue as to any material fact and that the movant

---

[3]The district court acknowledged Briggs' argument that UDM and Gaither were responsible for Meisner's alleged defamation under a respondeat superior theory and ruled that "[b]ecause the court has already determined that Meisner's alleged statements are not defamatory, the question of whether [UDM] can be held liable for Meisner's alleged defamation of [Briggs] is moot," Page ID 1795.

is entitled to judgment as a matter of law." *Samuels v. Corr. Med. Servs.*, 591 F. App'x 475, 483 (6th Cir. 2015) (emphasis added).

In deciding whether summary judgment is appropriate, this Court views "all evidence in the light most favorable to the nonmoving party." *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The Court must also "draw all reasonable inferences in [the nonmoving party's] favor." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## IV.

In support of his argument that he did not forfeit his Title VII retaliation claim, Briggs asserts that his response to UDM's summary judgment motion "mentioned the word 'retaliate' or some derivative form no less than 33 times." Appellant's Br. 38. While that may be an accurate statistic, Briggs appears to be conflating his Michigan state-law retaliation claim with a Title VII retaliation claim. Briggs may not preserve arguments in support of his claim of Title VII retaliation by pleading his claim of retaliation under Michigan's Whistleblower Protection Act. *See Brown v. VHS of Mich., Inc.*, 545 Fed. App'x 368, 371 (6th Cir. 2013) ("[E]ven if two claims provide the same remedy, a plaintiff asserting both needs to establish the legal elements of each.")

Briggs cited no authority and made no legal argument as to his Title VII retaliation claim before the district court. Indeed, a discussion of Title VII retaliation is glaringly absent in Briggs' summary judgment response which includes sub-sections devoted to Briggs' other claims. "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *VHS*, 545 Fed. App'x at 372 (quoting *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment) and *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006)).

That said, a district court may not use a party's failure to respond (in whole or in part) as a reason for granting summary judgment "without first examining all the materials properly before it under Rule 56(c)." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) (quoting *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979)).[4] This is so because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (quoting *Smith*, 600 F.2d at 64) (alteration in original). Therefore, even where a motion for summary judgment is unopposed (in whole or in part), a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists. *Id.* However, "[n]either the trial nor appellate court . . . will sua sponte comb the record from the partisan perspective of an advocate for the non-moving party."

---

[4]*See, also*, *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992) (citing *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989)) (holding that the "burden" of responding with specificity, involves presenting the record facts with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies, and that this burden is "really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden –for example, by remaining silent—its opportunity is waived and its case wagered.")

*Guarino*, 980 F.2d at 410. Based on the district court's articulated analysis we find that the court did not overlook any genuine dispute of material fact. *E.M.A. Nationwide*, 767 F.3d at 630.

The district court properly articulated the elements of a prima facie case of Title VII retaliation: a showing that the "(1) [plaintiff] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). "Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ('EEOC') and opposition to an apparent Title VII violation." *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 469 (6th Cir. 2012); *see also* 42 U.S.C. § 2000e–3(a). An employer violates Title VII by discriminating on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(2).

With respect to the first type of protected activity, Briggs was not retaliated against because he participated in an EEOC proceeding. To the contrary, his employment was terminated before he filed a charge of discrimination with the EEOC. Turning to Briggs' "opposition" to Title VII violation(s) as the basis for his alleged protected activity, the district court considered Briggs' assertion that he was opposing sex discrimination by reporting Gaither's affair and favoritism to UDM, and cooperating with UDM's investigation into his whistleblower report. Moving for summary judgment, UDM argued that Briggs neither engaged in protected activity nor had a good faith reasonable belief that he was doing so. Before the district court, Briggs failed to respond to this argument.

Even so, the district court conducted a protected activity inquiry.  Having found that UDM did not engage in sex discrimination, the district court held that the conduct underlying Briggs' protected activity claim was not—in fact—unlawful under Title VII.  Notably, Briggs does not contest the district court's finding that UDM did not engage in sex discrimination or any other conduct made unlawful by Title VII.

Recognizing that protected activity also includes "opposing any practice that the employee reasonably believes to be a violation of Title VII . . . whether or not the challenged practice ultimately is found to be unlawful," the district court continued its analysis.  PageID 1799 (quoting *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 570-71 (6th Cir. 2009) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000)).).  Specifically, the district court considered whether Briggs had a reasonable and good faith belief that he was reporting conduct that was unlawful under Title VII when he reported the affair and its alleged impact.

The record before the district court suggested that Briggs did not believe he was engaging in protected activity when he complained about the affair or when he participated in the ensuing investigation.  For example, in his response to UDM's summary judgment motion, Briggs admitted that he did not tell anyone about Gaither and Thomas' affair initially because the conduct only affected them and, although Briggs did not approve of the affair, he did not consider himself to be the "morality police."  PageID 1288.  In other words, Briggs recognized that an affair, while perhaps morally questionable, was not itself in violation of Title VII.

However, as the affair continued, Gaither allegedly began openly displaying favoritism towards Thomas at Briggs' expense, treating Briggs in a harsh manner and unfairly devaluing his work in order to further Thomas' career.  By the 2010-2011 season Gaither had allegedly blocked or rejected several student-athletes recruited by Briggs without justification in an

attempt to have available scholarships awarded to players recruited by Thomas. Despite these circumstances, Briggs waited another two years before he was driven to submitting a whistleblower report, which he states he did because of harm to his career and injustice done to student-athletes as a result of Gaither's open favoritism. On these facts, the question becomes whether Briggs reasonably believed that an affair *combined with favoritism* was unlawful under Title VII.

Briggs never argued before the district court that he believed that complaining of favoritism for a paramour was protected activity under Title VII, much less that such a belief would be reasonable. On the other hand, UDM argued persuasively that Briggs held no such belief and even if he did, such belief would not be reasonable. For example, UDM cited several cases, all holding that it was unreasonable for a plaintiff to believe that complaining of "favoritism for paramours" was protected activity. PageID 645-46 (citing *Stanley v. Insights Training Group, LLC,* 2013 WL 76123 (W.D. Ky. Jan. 4, 2013) and *Sullivan v. Paycor, Inc.*, 2013 WL 2286069, at *5 (W.D. Ky. May 23, 2013)).[5] Briggs did not cite any cases to the contrary, and the district court, after its own analysis, concluded that there were none. Page ID. 1799 ("[A]s far as this court is aware, every other court to have considered the issue has found that a plaintiff who expressed opposition to favoritism resulting from a consensual affair did not have a reasonable basis to believe he or she was opposing an unlawful practice.") (citations omitted). The district court's analysis ended at the first element of a prima facie showing of Title VII retaliation, after finding that Briggs failed to meet his burden.

---

[5]Though district courts in this Circuit and other Circuits to have considered this issue have been unanimous in their decisions, Briggs may be correct that we have not previously ruled on the merits of the issue in this Circuit. However, we decline to do so now and hold that this has no bearing on our instant review of the district court's articulated analysis "to ensure that it did not overlook any genuine dispute of material fact." *E.M.A. Nationwide*, 767 F.3d at 630.

In challenging the district court's decision on appeal, Briggs argues for the first time that a "reasonable jury could find that when [he] reported Gaither and Thomas's relationship and its resulting favoritism Briggs had a reasonable and good faith belief that he was reporting Title VII sex discrimination because the issue remains unresolved in this Circuit." Appellant's Br. 42. The underlying implication is that in the absence of Sixth Circuit precedent expressly stating that "a plaintiff who expressed opposition to favoritism resulting from a consensual affair did not have a reasonable basis to believe he or she was opposing an unlawful practice," Briggs must be absolved of an unreasonable mistake of law.

Unfortunately for Briggs, "[i]t is well-settled that this [C]ourt will not consider arguments raised for the first time on appeal," and we do not believe that "our failure to consider the issue [raised by Briggs] will result in a plain miscarriage of justice." *In re Hood*, 319 F.3d 755, 760 (6th Cir. 2003) (internal quotation marks and citations omitted); *see also Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) ("It is well-settled that this court's function is to review the case presented to the district court, rather than a better case fashioned after an . . . unfavorable order.") (internal quotation marks and citations omitted); *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988) (quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)) (noting that identifying circumstances where failure to consider would entail a plain miscarriage of justice is "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases"). Because the district court did not overlook any material fact in finding that Briggs failed to meet the first element of a prima facie case of unlawful retaliation under Title VII, we need not look any further.

V.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of UDM and Gaither.